Good morning, Justices. My name is Leo Donahue, and I represent Mr. Rill. Well, thanks for the promotion, but we're just judges. The only justices in the federal system are the nine wise people up above. I'm here this morning for two reasons, to ask you to overturn the summary judgment in the lower court. I hope I'm not one of the attorneys that ignores what the court focused on and focused on something else. But I think what I'm going to ask the court to do is make the determination that the lower court focused on the wrong, on the wrong thing or had half an argument. The first issue that I'd like to talk about is at will. And of course, the lower court waived on that. They just passed on that and passed it to to this level. Well, I'll just I'll be blunt with you. I don't see a single shred of evidence in this case that suggests that your client is anything other than an at will employee. If you read the California cases on all the factors that you refer to, they seem to say that that doesn't get you anywhere. And Merck itself says these are at will employees. It's in their documentation. How do you turn this into anything other than an at will case? Easily. I see it the other way. California court says that the Supreme Court of California said, look, we don't want an employer to tell their employees that they have a great future with the company, that if you come to work with us, you're going to have all these benefits and you can only be terminated for cause. But in reality, you're at will. The court says that if you create an atmosphere where the employee reasonably perceives that his termination must be for cause, then you've abandoned your at will procedures, whether it states it in the handbook or not. This is an employee who went to work in 1976. There's no evidence that Merck was even an at will employer in 1976. He came on board. The documents that brought him on board say nothing about at will. In fact, the first time that he was ever notified about at will was when they tried to slide him an at will agreement to sign the day they were firing him. That should say something about their concern whether or not he was at will. Well, I took an easier route, because I guess you could argue over this, and I wondered why, even if you assumed that he was not an at will, I couldn't understand that there was any factual issue with respect to cause, given the investigation of the employees and the sexually explicit material and the transmission of the material and the admission of it on his computer. I just didn't see a factual issue that would defeat summary judgment, even under a for cause standard. Where am I missing something? Putting aside at will, which I'd like to get back to, I think there was. I think if you look at the way we're asking the Court to look at the case, if we're asking and we're saying to the Court, here's a 24-year employee that worked daily, day to day to day he went to work under certain terms and conditions of employment.  There's no evidence in the record that anyone, except Mr. Johnson, who was the go-to guy for the procedures and policies, oh, yes, he said, I'm familiar that we have a policy against e-mail misuse, but I don't know what it is. I just have a general familiarity with it. Every other individual, VOCA, the other individuals that testified said, we know nothing about any kind of e-mail policy. There was nothing that we had access to. What about the workplace harassment policy, which your client acknowledges knowing about? And my client didn't work in the workplace. We know that. My client worked at home. Well, your client worked in a virtual workplace. A virtual workplace. I guess he could have sexually harassed himself. No, he was sending things to other people. Well, let's look at that. The sexual harassment policy, what if this was a consensual sex issue that I brought to the Court? And I tried to say, my client was sexually abused. Your answer to me would be, it was consensual sex. You can't have sexual harassment when it's consensual. The policy that Merck has is typical of every policy in every employment. It says, the standard is, any unwelcome or unsolicited material or whatever based on sex may form the basis of a sexual harassment complaint. There is no evidence that my client ever sent anything to anyone that was not received in kind first or was objected to whatsoever. Well, here's what the policy prohibits. You know, we think of sexual harassment as it typically evolved with somebody inviting out or having inappropriate sexual contact with some employee. But the Merck sexual harassment policy included something very specific. It prohibits sexual jokes or inappropriate use of sexually explicit or offensive language and the display in the workplace of sexually explicit or subjective objects or pictures. And I agree with that. Well, I mean, that's what it prohibits. I don't think so, because it says above that. Those are examples of what the policy is. In other words, if I had a workplace and I worked for a company and we were in a garage and the garage had pinup calendars as they used to, and it was all the people in that garage agreed that those pinup calendars were okay and they had the exact same policy that Merck had, I don't think that would be sexual harassment. Because the policy statement above that says it has to be unwelcome, based on the recipient's sex. None of these were based on the recipient's sex. There is no recipient. It was not based on the recipient's sex. It's not based on gender. There was no harassment based on gender here. These were documents, these were communications that were sent to him from doctors, from other people. And as the practice of Merck was, you would send something back with a joke on it. So I thought he admitted he sent pictures of people engaged in sex acts to his colleagues over the e-mail system. No. No? Well, he said the only – if you look at the received and sent section, and the way that got confused was there was a undisputed fact that said there was communications. It didn't say whether he sent or received people engaged in oral sex. The lower court misinterpreted that undisputed fact and said that Mr. Rill had sent a picture to someone else of someone engaged in sex. That's wrong. It never happened. That never occurred. Mr. Rill in his deposition said that never occurred. What he said was he sent the picture and we saw the picture of the three individuals at the basketball game or whatever it was. That's no different from the picture he received of the nude soccer team, frontal nudity, from his own boss, Mr. Duffy. So what I'm saying is here we have – Well, that's a separate issue. I mean, Mr. Blake, Blake Hennington, gets the ultimate bearded clam exclamation point. He says, absolutely disgusting. Now, how do I get it out of my computer? He says to Mr. Rill. I mean, and then we've got these photographs that are in the record. I mean, there are definitely sexually explicit materials that passed from his computer. And I agree with that, that there was sexually explicit materials. There was sexually explicit materials that he received from his supervisor who was not terminated. Right. But he was terminated for what he sent, not what he received. But talk about what he sent. Where did they go to? Who did they go to that Mr. Rill sent them to that were offensive? There's nothing in the record that any one of the documents that was proven that Mr. Rill sent to anyone where there was any objection for it, because he didn't do it. In fact, what he testified to was, I got these before I sent them to anyone, because then I knew that it would not be objected to. So if we have a consensual situation in a workplace not based on sex, there was no – this wasn't based on the, quote, recipient sex. It wasn't. If we have that situation where everyone consents to it, how can that be sexual harassment? It can't be. And this is an individual who was sending and receiving these from his home. He was the only one in his office. There was no one else there. Unlike his supervisor, who had the penis joke on his computer that everyone saw, who was not terminated. So we're saying that if you follow Merck's policy – in fact, I would have a hard time bringing a sexual harassment case based on these facts. I would have a hard time coming to court and saying, well, yes, I did consent to all these things, and I never objected, but please find sexual harassment. And there's not a scintilla in the record that Mr. Merck sent – Mr. Rill sent anything to anyone that was offensive, that was based on the recipient sex, that was unwelcome. Then – and I don't think you – you can't get past that part and go to the examples and say, well, there was a picture. He sent this bad picture. Those are examples of what may be sexual harassment if you fall within their own parameters. And their parameters – Well, it's actually, to be more precise, it's – in their policy, it's workplace harassment, not – sexual harassment is a separate thing. Right. In California law 12940, the section on this says the same thing. It's unsolicited, unwelcome. My God, if you try to bring a case of consensual sex, you're not going to get anywhere. And that's how we see this. That's how we read it. Besides the fact he's in his home. This was not on the computer for anyone else to see. That's the sexual harassment part. And the lower court indicated in their order that Mr. Rill's – we're going to overrule the sexual harassment because Mr. Rill said he didn't think it was sexual harassment. That was it. One, two sentences in their whole order that we're asking that this Court turn around. Now, the at-will part, I want to do that quickly because I want to talk about cause. If you look at – this is a guy who comes to work in 1976. We were just getting out of Vietnam in 1976. He works for this company for 24 years. He works within a certain parameter. You saw how he described working for this new boss. They were like hormone with feet, these people that he was working for. The sexual jokes all over the place, that things were passed back and forth in the office. He had to kind of go along with that to survive. So he's in this situation. And I guess the crux of my argument is practice versus policy. And it upset me that the lower court took as gospel that they had a written policy, that they could trot out every once in a while and say, look, here's our policy. You're at will and you did this wrong. But they run their company with the practice. And the practice, I mean, throughout impregnated in our brief is everyone said it's rampant. These emails are rampant. Everyone's doing it. That's the practice of the company. No one's been disciplined for it. Mr. Rill's boss didn't even know there was a policy. How many people were fired as a result of this investigation? They fired, I think, three, seven. They fired seven people total. And that gets to another issue, that his 50,000 people in Merck, they do an investigation, they get to a certain point and they cut it off. But that's another issue. But here's an individual who comes to work. He doesn't sign an at-will agreement. He's never shown an at-will agreement. He is told this is an oral promise. In California law, it's as good as a written promise. He is told if you do your job here, you can't be terminated without cause. That's what he's told. So he goes along with this. He then witnesses people being fired. Other people came in. Mrs. Boker came in. Mr. Johnson, Moses Johnson, who worked his way up through the company and finally was the go-to guy for policies and procedures. This is the guy who everyone went to in the company if you had a question on policies and procedures. I asked him, what's the practice? He said very clearly, we don't terminate without cause. That's exactly what the California law is designed to say. If the employee has a reasonable expectation that he's not to be treated arbitrarily and capriciously, and that's what without cause ---- Whose testimony was that? Mr. Moses Johnson. But didn't the California court in that goose against Bechtel deal with a similar kind of claim and say that kind of general promise was not enough? Indeed not. What they said was one comment by one individual that no one else knew about was not enough. They didn't say that if you went to the man who's responsible for policies and procedures in the company and he thought and his policy was that you terminate only for cause, and other individuals, BOCA, all the declarations that we submitted with the paper, and my boss's boss, Mr. Duffy, every single one of them felt that it was not at will, but you had to terminate for cause, period. No one in the company even knew it was at will, except when they brought out the Neville Chamberlain kind of a document, at will in our time. What does California Labor Code tell us about contracts that don't have any specified period of time attached to them? There is a presumption. And as Mr. Wigmore said, the presumptions float to nothing when they're pricked with one fact. One fact. The presumption in the Labor Code 2293 is that your employment is at will. And it's kind of like the pregnancy curve. You're either pregnant or you're not. It's not you're more at will or less at will. If you're at will, I can fire you arbitrarily and capriciously. The minute I move away from that arbitrary and capricious standard, I'm not at will anymore. Even their own policy says we can terminate you for any reason. It doesn't say most at will policies say for no reason at all. This one says we need a reason. Their standard, their policy manual has progressive discipline. He worked there 24 years. He all the factors that say that the California. It says we can terminate you for any reason. Correct? Any reason. Any reason. It says we can do it with or without notice. It doesn't say good reason. It just says any reason. Any reason. Any reason. I don't like your tie. That's a reason. I do like your tie. But if I didn't like your tie. That's a reason. And left alone. That's a reason. Okay. And I would say, geez, I'm in trouble if that's the only fact I have. But I have 24 years of him being told that if you do a good job, you're going to be there. I have no at will signature on that, that he ever see that. They try to slip it to him on the way out the door. That should tell us something. The facts are also that the contract that he signed is silent on at will. And remember, our job here is not to prove that he's at will. It's merely to raise, to submit to the Court enough evidence where the Court can say, there's a question here. There's a question here. And this calls for, I think, as opposed to the summary judgment level, I think it calls for a thorough scrubbing of the facts. It calls for 12 people sitting over there. What did they say to you the first day? Six people come in and say, this is at will is nothing. I was a manager. They told me you have to do this. Well, the district judge punted on that issue. He did. He gave it right to you up here, I believe. And I think there's enough facts to raise the question if you're at will. I mean, the Foley factors are there. And there's enough of them there where the Court should say, all right, let this go through a clean scrubbing of the facts. Let the trier factor this. We don't want to weigh it, and we don't want to judge credibility. You have three minutes. Do you care to keep going, or do you want to save that? Save three. Your choice. Because I want to talk about the standard for termination. Thank you. Good morning, honorable judges. My name is Sam McAdam. I'm with law firm CIFAR-SHAW, and I represent the defendant in the Apelli Merkin Company. Not to destroy your prepared remarks, but counsel made a very impassioned plea for at least the proposition that there's an issue of fact on whether this was at will. And he says that this is a classic case. There's a dispute. There are enough facts to get to a jury. There's a genuine issue of material fact. What do you think about that? Yeah. I was listening attentively. He didn't cite to the record once. There isn't a shred of evidence that would substantiate that he has met the test set forth by the California Supreme Court and Gus V. Bechtel that Mr. Rill was anything but an at will employee. The starting point for the analysis, Your Honor, is Labor Code Section 2922 of the California Labor Code that says there's a presumption of at will employment in California. And since Gus V. Bechtel, that presumption has been strengthened because it's clarified exactly what an employee must prove in a wrongful termination or a breach of contract claim. And I will admit that the body of case law since Gus V. Bechtel is not full and rich. This is an opportunity for the Ninth Circuit to clarify this for the district courts. In fact, it was pointed out that the district court in this case punted. And I think that this is a nice record upon which to deal with the issue. I will say, first of all, that Mr. Donahue relied upon vague assurances over time. Mr. Rill was told, and there is testimony in the record, that you're going to have a job throughout your career as long as you do a good job. That's ten lines in his deposition. That is the single piece of evidence that he's offered that deals with Gus V. Bechtel. But what about Mr. Johnson, who was the gentleman who oversaw the investigation? He referenced specific testimony from Mr. Johnson who says we don't fire people, you know, without cause. Are you saying that's not in the record? No, Your Honor, that is in the record. Mr. Johnson was asked, do you normally have a good reason to terminate employees? And Mr. Johnson, who was an ethics officer for Merck, said, yes, we normally have a good reason to terminate employees. No, wait. I have that one, and it doesn't say anything about normally. It says, has it been your observation in your work with Merck that it's also been Merck's practice to discharge employees only for good reason? Answer, yes. Now, that doesn't say normally, does it? Fair enough. I'll withdraw my qualifier for normally. My point would be, what ethics officer or what president of the company or what manager would say to anyone who asks a question, do you normally do you have a good reason to terminate? And what he would say was, well prepped, our policy is at will. That's what he would say. But he didn't say that. I take issue with that, Your Honor. I think in the real world an employer would say we have a good reason because that's rational. An employer should have a good reason to terminate employees. Now, in Gusby Bechtel, the president of Bechtel testified and had a statement that said, we always have a good reason when we terminate employees. And the California Supreme Court said that that was insufficient as a matter of law to rebut the presumption of that will. And, in fact ‑‑ This brief and vague statement by a single Bechtel official that Bechtel sought to avoid arbitrary firings is insufficient as a matter of law to permit a finding that the company by an unwritten practice or policy on which employees reasonably ran and contracted away its right to discharge because it will. That's the language you're talking about? Yes. The president of Bechtel said that. And I would say, here's my really big underlying point on this. That if an ethics officer or supervisor or president of the company was required to say, no, we're at will and we can fire employees randomly, and then to secure the at will employment in the state of California, Merck or any employer would have to randomly fire people, well, it's Friday, in order to preserve the at will employment doctrine of this state, we need to let a few people go because we don't like their tie. We don't like the way they came in and hummed a song this morning. And that's not the law. The law is clear in California. We want to encourage employers to have good reasons to terminate employees. And, in fact, Merck acted incredibly responsibly here. They didn't fire Mr. Real arbitrarily. They conducted an investigation and so forth. Nonetheless, even though they carried out and met the four cause standard, they are an at will employer in California. And there is nothing in the record that Mr. Real was promised by supervisors that he was a four cause employee. There was a vague statement by Mr. Real in his deposition that he received such promises. He doesn't say when. He doesn't identify the supervisor. He doesn't indicate that the supervisor had authority to make such statements. In fact, the at will policy of Merck expressly says that line managers, managers do not have the authority to alter the at will employment status. So other than his testimony and Mr. Johnson's, those are the only two pieces of evidence that we have to look at to determine whether there's a material issue of fact. Is that right? Yes. And I would say. Well, Real testified he was told by serial managers from serial divisions that, quote, as long as you do a good job, you're assured of a career here until you retire. That's the statement I'm referring to. And I believe, along with Dr. Johnson's statement, that that does not raise a tribal issue of material fact. It doesn't even remotely come close to what in Gusby Beckle the California Supreme Court said was necessary. In that case, Your Honors, the California Supreme Court said you need to have something from, if there's a presumption of at will employment, okay, you need to have something direct to that employee, preferably a written policy. In that case, dealt with a layoff. And they wanted to see that there was layoff procedures that were written down that were followed and were not followed. But you need to have something that is clear and direct to counter and rebut the presumption of at will employment. And the type of evidence that you would need would be, you know, a written statement saying, Mr. Real, you're different than all of our employees in the workplace. We're not going to treat you like the other ones. You've had a successful career and we want to secure your employment with some form of consideration. There has to be something more direct. And I would submit that there's nothing here in this record that even remotely touches on the Gusby Beckle standards. Now, in touching on the harassment question, Mr. Donahue made a representation to the court that Mr. Real never admitted to having sent email with sexually explicit pictures. In his deposition testimony, page 128 to 129, he was asked, let's start easy. Did you ever receive any pictures of a naked human being? Yes. Did you forward those pictures of a naked human being to anyone else? Yes. I'm not trying to make a trick question. The question is, did you ever receive pictures of two people engaged in a sex act? Yes. Did you ever forward pictures of two people or two people engaged in a sex act to any of your colleagues? Yes. Deposition testimony, uncontradicted, page 128 and 129 of his testimony. And I would say Mr. Donahue made a large point of saying, well, this didn't rise to sexual harassment because it was consensual. And Merck's position on that is, as a responsible employer in the State of California, it doesn't cede control to its sales force about what is acceptable exchange of sexually explicit pornographic email and put the judgment into the hands of its sales force using its computer system, its Internet connection, and its computers. It doesn't ---- If you did that, you'd be wide open for sexual harassment by female employees, for example, who were surrounded by this stuff and who ran into it. And our concern, Your Honor, exactly, and our concern, Your Honor, is that Mr. Rill, even to this day on appeal, considers it a business justification that this was, quote, a social lubricant to doing business with doctors and nurses and coworkers. And if an employer in the State of California has to be held hostage by its sales force, that they can take the freedom and the liberty to decide when they have the consent of the recipient on the other end to send pictures of people engaged in sex acts, and that somehow advances the business cause of Merck, then we've turned the law of sexual harassment and the law of responsible employers on its head in this State. Does Mr. Rill claim this is a necessary sexual lubricant or a social lubricant, excuse me? That's repeated. It was used in the trial court. The actual word social lubricant came out of the declaration of Lori Latchford, and it was relied upon in the moving brief to the court of appeal. I don't have that exact page number at my fingers. But I could tell you. Page 491 of his deposition, I wish I had the excerpt slide for you. of Merck's excerpts of records. The plaintiff indicated that the use of sex jokes and sex pictures was a no-brainer to him because it served a business purpose. That would be my point. Are you paraphrasing? I want you to read what he said. I don't have the exact quote. I am paraphrasing. This was in the separate statement of undisputed facts. It's at page 55 of the Merck excerpts of record, and there was no dispute that was substantiated by evidence in opposition to fact 64. I'd like to touch on, if the court would allow me, I'd like to touch on four cause. And that is that the standard of four cause is set forth in the California Supreme Court case in Cotran. And I think that's why this case is a nice one for the Ninth Circuit. We've got two discreet issues. One's at will employment, and we've got guidance in the last five years from the California Supreme Court and Guzz V. Bechtel. And on the four cause issue, Your Honors, we have guidance from the California Supreme Court in the last five years in the Cotran case. And in the Cotran case, it was the California Supreme Court set forth a clear standard that says the employer has to have a reasonable and good faith belief that misconduct has occurred in the workplace. Ultimately, when it goes to a jury, the jury doesn't sit as a, or the fact finder on summary judgment in this case, doesn't sit as a super HR professional administrator. Rather, the jury is there to determine whether the employer acted reasonably. And how do you act reasonably? According to the California Supreme Court, you conduct an investigation and you apply reasonable and good faith standards. Okay? So based on that, and you act honestly, based on that, what did Merck do in this case to establish good cause? It conducted an investigation focused on a legitimate purpose, and that is to determine whether its computer system was being misused for the exchange of sexually explicit materials. It used the office of the ombudsman. I mean, fortunately, Merck is a Fortune 50 company with the resources and the ability to attract capable people. They're in a unique position and have their own separate office of the ombudsman with highly trained ethics officers.  They used independent trained investigators. What did they do to determine whether misconduct had occurred? They used objective evidence. They went to the computers and they did a 60-day restore on those persons whose names had come up in the complaint. A 60-day restore. So they had objective evidence, and you all have in the record the 60-day restore that showed up for Mr. Rill. They provided interviews opportunities for all of those persons that they believe, based on the restores, had violated good business judgment and its policies. And they gave an opportunity to explain, and they said, what explanation do you have for this conduct? Do you admit that it occurred? Do you know of anyone else that it occurred? We're doing a complete investigation of this. Okay. And Mr. Rill admitted to the content of his restore, and he admitted that he had violated the policies and sent sexually explicit material. Who was Mr. Duffy? Tim Duffy was Eric Rill's line manager. They were in Sacramento area. And what did he do, and what, if anything, happened to him? That's a very good question, and that's in the record. What's the answer? The answer is he had exchanged inappropriate jokes. Pictures, too? He had one picture that was clearly a violation. It was offensive and clearly a violation of the policy. It was four women dressed with dresses. It was a candid shot, and one of the women, you could tell, did not have underwear. So Duffy and the appellant in this case both violated that policy in a similar way? No. Not even close, and that's an important point for Merck. Duffy was not terminated. Duffy was not terminated. Which raises the possibility that the termination of Rill was arbitrary because they didn't terminate Duffy. What's the problem with that argument? Not based on the record. It wasn't arbitrary. Again, the fact finder is allowed to give the business discretion to the employer. Here's what the employer did, and here's why it's reasonable and rational based on the investigation. Okay? Tim Duffy's restore is in the record. It was attached to the Declaration of Pamphlet. A 36th generation Xerox copy which nobody can see. I mean, I tell everybody that the excerpts of record are a joke because by the time you Xerox a Xerox a Xerox a Xerox, you can't see anything anymore. Thanks for the tip. I'll remember that next time I come up. One of my enterprising clerks found it on the Internet. Okay. So he saw it. Okay. Well, I'm sorry you had to use it. Under my direction and control. Okay. The fact is that what Duffy did was different from what Real did. But is that an issue of fact or an issue of law? Well, it's before the court. It can be decided on summary judgment, Your Honor, because what Cotran says, and Silva v. Lucky Stores was a summary judgment case that followed Cotran that says you can decide this issue as a matter of law based on undisputed facts. And the restores are in front of the court, and the court can decide what. If what Duffy did wasn't as bad as what Real did, that explains why it wasn't arbitrary. Not even. Why don't Real and keep Duffy. I'm sorry to interrupt you. Not even close. Okay. There's no evidence in the record that when Real or, excuse me, when Merck did its investigation, that it had any basis to conclude that Tim Duffy had exchanged pictures of people engaged in sex acts, had sexually explicit pornographic material on his website. Mr. Real was asked whether other people, excuse me, using his e-mail, Mr. Real was asked whether there was anybody else that had sent these things. You know what he said about Tim Duffy? He said Tim Duffy sent me sports jokes. Okay. And that's all that Mr. Real said. He was asked again, Mr. Real was asked again in his termination meeting, is there anything else you want to share with us because we find that you've violated the policy. There's not much more that an employer can do other than conduct an investigation. They did a restore on Mr. Duffy, a restore on Mr. Real. They conducted interviews. And they came up with a scale, Your Honors, that the transmission of sexually graphic, pornographic material was in a Class I and warranted a dismissal. And less offensive sexual jokes and materials were in Class II that required discipline and warning.  Why wouldn't it be, you know, if we, of course, have the clear picture, which one can interpret for yourself what actually that picture is, Mr. Duffy had. But he was a supervisor, correct? So why doesn't that raise this factual issue of, I mean, it's one thing to say, okay, we're going to weigh the pornography and this is, like, worse than that and put it on some kind of scale. But the smaller scale, at least as argued by Merck, comes from a guy who's the supervisor. So why isn't that a factual issue for the jury to kind of go in and figure out, you know, how those scales balance? First, I wanted to finish the answer, and I think it leads to that, is that Mr. Duffy was severely disciplined. He was denied he was given a low leadership rating, denied a promotion for three years, and docked $15,000. $15,000. That's not like losing your job of 24 years. No, it is not. And basically what the ‑‑ I think this comes back to Cotran, Your Honor, and Lucky V. Silva. And they say, listen, what the role of the court is to do is to determine whether there was a reasonable basis for the decisions, for the standards that Merck came up with, for the classifications, and for where they put individuals in those classifications, okay? And as long as the employer had a reasonable and good faith belief after conducting the investigation that there were differences that warranted different employment actions, then the decision can be decided as a matter of law based on the undisputed facts. Can I ask you a question, a procedural question, because the notice of removal wasn't included in the excerpts of record that we had, although I didn't get a chance to go back to the original record. I know that the complaint didn't contain appropriate identification of citizenship. Did Merck's removal notice do that? It did, Your Honor. It did. What did it say about that? Merck is principal place of business, which I've been to, is in New Jersey. I believe that it's either New Jersey Corporation or Delaware Corporation. And it was included in the diversity removal papers. And I know the complaint identified Rill's place of residence, but it didn't say citizenship. Did the notice of removal talk about that? Yeah, it did. He's a California resident and citizen. Citizen as well. Working and living here in the state of California. Thank you. Okay. Your Honor, I've got just a few seconds. Your Honors, I would just encourage you to take a hard look at the at-will issue, and we believe there was cause as well to terminate, and we ask the Court to affirm the district court's order. Thank you. Thank you. Three minutes. Number one, we're not saying that the way you have to prove this is that you have to – California employers now have to run around firing guys because of ties. No. What we're saying is be honest with your employees. Be honest with them. You know, don't tell them, don't lead them on for 24 years that you're with us, you're a part of the team. We can't terminate you unless it's for good cause. Let me put it this way. The only fact that they presented that he is at-will, besides the presumption of the California law, is an at-will agreement, an at-will policy, that there's no evidence that Mr. Rowe was at-will. Well, but there's no specification in the original contract or any contract he ever signed that specifies the term of employment or the conditions under which he can be let go, and that's a standard at-will agreement. No. Right. That's a standard at-will agreement. Well, that's what he signed, and you take a look at it. No, no, no. He didn't sign that. He didn't sign this. When he first came on board. Right. On board. No mention of at-will. None whatsoever. That's the whole point. He wasn't given a term of employment or told the conditions under which he could be fired. He was just hired. Well, he was told the conditions. He was given. It's in the record. He was given conditions of employment. And they said, this are the conditions of your employment. It's a three-page document right next to the June letter when he was hired. And it didn't say anything. It didn't say protect this, protect that. It didn't say anything at-will. Then they came up sometime later with an at-will agreement that not only he didn't see, Lori Latchford didn't see, Boca didn't see, Tim Duffy didn't see, and Mr. Johnson, Mr. Johnson, who was the go-to guy, the guy in charge, the ombudsman, the honest guy who did this great investigation, he said very specifically when I asked him in the exhibits, I said to him,   It's a lot more than guts. And so he said, yes. And so I'm going to go back to the other two. Three statements that he laid out that were extremely, this is a lot more than guts. Has it been your observation in your work with Merck that it's also been Merck's practice to discharge only for good cause? Yes. And I guess the crux of the matter... That's not inconsistent with an Atwill agreement. Well, I think it is. You have to have, I think you have to make a difference between practice and policy. And the Ninth Circuit says that and the Supreme Court says that. The Supreme Court says you can't lead someone on for 24 years with practices that permeate the company and then trot out a policy that no one knows about. No one knows about. There was no evidence in guts that anyone else didn't know about Atwill. We're saying here, no one knew about the Atwill policy. Who's this Latchford who describes this environment as a social lubricant that Merck uses? She was one of the ones who made the initial complaint concerning the harassment. And she had a similar job. She was a work at home, a stay away from the company. All of these policies were on the intranet. Mr. Merck did not have... She was the one who made a complaint and said there's a rotten atmosphere here and Merck seems to tolerate all these kinds of jokes. Oh, they all said that. They all said that it permeated. Mr. Duffy said it. To whom did she make the complaint? She made it to the investigators, for one. And she made it to her supervisors. She made it to Mr. Merck. Times have changed. There was another picture also that Mr. Duffy sent. Mr. Duffy, let me back up. A standard. Remember he mentioned Class A, Class B standards? Class A said sexually explicit awe, front and nudity. Awe, front and nudity. It's undisputed that Duffy sent front and nudity. And he wasn't... And that picture of the women sitting there? No, women's soccer team. Women sitting there and the women's soccer team. The women's soccer team didn't show up in the discovery, but it was in the deposition. So that's a factual dispute. In the standard, we laid out the standard. Is there a photo of the women's soccer team in the excerpt of record? Nope. We couldn't get it. There was testimony of it, testimony that it was received by Mr. Rill from him, but it didn't show up in his, what do they call that thing, when they went into the... Restored it. So it's gone, it disappeared. Disappeared. So the only thing we have is the women sitting there. That's the only picture we have. Fully clothed, but still exposing. Well, not only exposed, but the genitalia is exposed. So that qualifies as exclusive and frontal nudity, and he wasn't terminated. And we set forth the standards at Jones v. Costco as to what they have to do to determine someone. It's on our brief at page 28. And if you, maybe it's me, maybe I'm missing this. How can a company, 24 years, half his life with this company under, gee, I thought these were the rules. Everyone thought they were the rules that we worked under, the practices. And then they trot out a policy, and that's good enough. It just goes beyond me. Times have changed. People used to behave in ways that we think now are very offensive. In the workplace, in society, on the streets of our cities. It's a whole different place. But the California law said the same thing, that if a reasonable person, that's the standard. No matter what the cases say, the standard is could a reasonable person, and they set up the Foley factors, could a reasonable person believe that he was not terminable except for good cause. That's the standard. And that breeds honesty on the part of the companies, too. Thank you, counsel. The case just argued as ordered, submitted. We'll take a ten-minute recess before hearing the rest of the cases. Thank you. Thank you. Thank you.
judges: Trott, McKeown, Shadur